# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs May 19, 2010

## STATE OF TENNESSEE v. NELSON AGUILAR GOMEZ & FLORINDA LOPEZ

**Appeal from the Criminal Court for Davidson County**
**No. 2007-D-3177      Cheryl Blackburn, Judge**

_____

**No. M2008-02737-CCA-R3-CD - Filed September 10, 2010**

_____

The Defendants, Nelson Aguilar Gomez and Florinda Lopez, were charged with: Count One, first degree felony murder during the perpetration of aggravated child abuse; Count Two, first degree felony murder during the perpetration of aggravated child neglect; Counts Three and Four, aggravated child abuse occurring on or about March 3, 2007; and Count Five, aggravated child abuse occurring in February 2007.  Aggravated child abuse is a Class A felony.  See Tenn. Code Ann. § 39-15-402(b).  The Defendants were tried jointly before a jury.  Defendant Gomez was convicted of both counts of felony murder, Count One merging into Count Two, and sentenced to life with the possibility of parole.  He was also convicted of all three counts of aggravated child abuse and sentenced as a violent offender to twenty-five years for each conviction.  The trial court ordered him to serve his Count Three and Count Four aggravated child abuse sentences concurrently with each other and his life sentence, and ordered him to serve his Count Five aggravated child abuse sentence consecutively to his other sentences, for a total effective sentence of life plus twenty-five years in the Department of Correction.  On her felony murder charges, Defendant Lopez was convicted of two counts of the lesser-included offense of facilitation of first degree murder, a Class A felony.  See Tenn. Code Ann. § 39-11-403, -13-204(a).  Count One was merged into Count Two.  Defendant Lopez was also convicted of aggravated child abuse under Counts Three and Four.  She was acquitted of aggravated child abuse as charged in Count Five.  She was sentenced as a Range I, standard offender to twenty-five years for her facilitation of first degree murder conviction and sentenced as a violent offender to twenty-five years for each of her two aggravated child abuse convictions.  The trial court ordered her to serve these sentences concurrently, for a total effective sentence of twenty-five years in the Department of Correction.  In this direct appeal, Defendant Gomez contends that: (1) the trial court erred in admitting evidence of certain prior bad acts, in violation of Tennessee Rule of Evidence 404(b); (2) the State presented evidence insufficient to convict him and that the trial court therefore erred in failing to grant his motion for a judgment of acquittal; and

(3) the trial court erred in ordering consecutive sentencing. Defendant Lopez contends that: (1) the trial court erred in denying her pre-trial motion to include non-citizens on the jury; (2) the trial court erred in preventing her from introducing an entire statement she made to police after the State impeached her using part of that statement; (3) the trial court erred in admitting evidence of Defendant Gomez's prior bad acts; (4) the State presented evidence insufficient to convict her; and (5) the trial court erred in imposing the maximum sentence for each of her convictions. After our review, we reverse and dismiss Defendant Gomez's Count Five conviction of aggravated child abuse. In all other respects, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part; Reversed in Part; Remanded**

DAVID H. WELLES, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, J., joined.

Nathan Moore, Nashville, Tennessee, for the appellant, Nelson Aguilar Gomez.
Jeffrey Devasher, Assistant Public Defender, (on appeal); and J. Michael Engle and Mary Kathryn Harcombe, Assistant Public Defenders (at trial), Nashville, Tennessee, for the appellant, Florinda Lopez.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

The events underlying this case involve the March 3, 2007 death of the Defendants' three-month-old daughter, Azucena Lopez-Lajuj. The Defendants were jointly tried before a jury on September 23-26, 2008.

The State's evidence established the following chronological portrait of the events surrounding the victim's death. Josefina Lopez testified that Defendant Lopez, her sister, came to Nashville from Guatemala about two or three years before the time of trial. Ms. Lopez met Defendant Gomez in Nashville through Defendant Lopez. Eventually, Ms. Lopez, Defendant Lopez, their brother Jamie, Defendant Gomez, and Ms. Lopez's husband rented an apartment together on Plus Park Boulevard. Defendant Lopez was already pregnant at that time. Ms. Lopez said that Defendant Lopez was happy about her pregnancy, wanted to have children, sought out prenatal care, and read books about child care. The

Defendants still lived with Ms. Lopez in that apartment when the victim was born in November 2006. They moved out about a week before the victim's death.

Ms. Lopez saw the victim once during that week, on Thursday, March 1. Ms. Lopez testified that she held the victim during that visit and observed no injuries. She acknowledged, however, that she had previously told Detective Sarah Bruner of the Metro Nashville Police Department ("MNPD") Youth Services Division ("YSD") that she observed small scratches under one of the victim's eyes. Ms. Lopez explained at trial that she assumed these scratches had been caused by the victim's long fingernails. She recalled advising Defendant Lopez to trim the victim's fingernails. Ms. Lopez also acknowledged telling detectives that she had concerns about the way Defendant Gomez held the victim, and that she had held a baby-sized doll around its waist in order to demonstrate her concerns. She explained at trial, however, that her concerns came from Defendant Gomez's placement of the victim in a baby swing, the rim of which circled the victim's waist; Ms. Lopez had never seen a baby swing before and had been unsure about the victim's safety while in the swing. Speaking through a translator, she had been unable to effectively communicate the exact nature of her concerns to detectives.

Ms. Lopez otherwise noted that she never noticed any injuries on the victim, and that the victim seemed healthy and happy on March 1. Ms. Lopez never saw either of the Defendants mistreat the victim.

Francisco Diaz Manzo testified that he supervised Defendant Gomez at La Hacienda Tortilla Factory ("La Hacienda"). He never met Defendant Lopez. Mr. Manzo said that Defendant Gomez told him that he was tired because the victim's frequent crying had kept him awake. Mr. Manzo suggested that Defendant Gomez take the victim to a doctor. Defendant Gomez responded that he was afraid to do so because he had accidentally dropped a baby bottle on the victim's eye while holding her recently. Defendant Gomez believed the police might arrest him if someone saw the resulting injury. Conversations of this nature took place on a Wednesday and a Thursday; Mr. Manzo could not remember, however, if they took place during the week of the victim's death or the week before that.

Francisco Sontay, his common-law wife Maria Ixpata, and Juan Antonio Sis Garcia had all lived with the Defendants for about a week at the time of the victim's death. Mr. Sontay testified that he originally met both of the Defendants at his place of employment, La Hacienda, where Defendant Gomez also worked. He had no relationship with them until they began living with him, however. To his knowledge, the Defendants moved from their previous residence because Defendant Gomez "didn't feel right there."

Mr. Sontay testified that on Friday, March 2, he returned home from work at about 2:45 p.m. The victim and the Defendants were present in the apartment; Defendant Gomez sat on the living room couch with the victim while Defendant Lopez worked in the kitchen. Mr. Sontay said the victim did not have any marks on her face or any other noticeable injuries. Mr. Sontay immediately went to his room and fell asleep because he was due at his second place of employment, St. Thomas Hospital ("St. Thomas"), at 5:30 p.m.

Mr. Sontay woke up and left for his shift at St. Thomas. He did not see the victim, but noticed that some light was visible under the closed door of the Defendants' and victim's bedroom. Mr. Sontay worked at St. Thomas until about 8:45 p.m., at which time he drove to La Hacienda to pick up his other coworker and roommate, Mr. Garcia. Mr. Sontay and Mr. Garcia arrived back at their apartment sometime between 9:20 and 9:30 p.m. They sat in the living room with Ms. Ixpata. Sometime thereafter, Defendant Lopez entered the apartment, went to the bedroom she shared with Defendant Gomez and the victim, briefly went to the kitchen, and returned to her bedroom. Mr. Sontay eventually fell asleep in the bedroom he shared with Ms. Ixpata. He did not hear any noises come from the Defendants' and victim's bedroom.

Mr. Sontay woke up at about 7:30 a.m. on Saturday, March 3. He did not hear any noises or observe anything to indicate that something was wrong. At about 9:30 a.m., he saw the Defendants exit their bedroom holding the victim; they left the apartment without asking for assistance or communicating that the victim was not breathing. Sometime that afternoon, Defendant Lopez spoke to Ms. Ixpata on the telephone and relayed that the victim had died. Mr. Sontay saw the Defendants when they returned home later that evening; they did not explain what had happened to the victim.

Mr. Sontay said that no one but the Defendants ever cared for the victim. He affirmed that the victim seemed healthy and happy and that he never saw either Defendant abuse her, although he acknowledged that he had very limited contact with the Defendants.

Ms. Ixpata confirmed that she shared an apartment with the Defendants, the victim, Mr. Sontay, and Mr. Garcia in March 2007. She also worked at La Hacienda at that time. Ms. Ixpata said that on the morning of Friday, March 2, Defendant Lopez drove her and Defendant Gomez to La Hacienda. She also picked them up, at about 2:00 p.m. The victim sat in a baby car seat in the back of the vehicle Defendant Lopez was driving. Defendant Lopez mentioned that she planned to give the victim a bath. Ms. Ixpata did not notice any marks or injuries on the victim.

Ms. Ixpata went to sleep upon returning home. She later woke up and, at about 5:00 p.m., went to St. Thomas with Mr. Sontay. She did not see the Defendant or the victim

before leaving, but noticed that their bedroom door was closed. She said it was normal for Defendant Gomez to be in the bedroom with the victim while Defendant Lopez was at work.

Ms. Ixpata fell asleep after returning home from St. Thomas, and did not wake up until she received a call the next afternoon from Defendant Lopez informing her that the victim had died. Defendant Lopez was crying and very upset during this call and did not offer an explanation of the victim's death. Ms. Ixpata and Mr. Sontay later met the Defendants at Baptist Hospital ("Baptist"). Neither Defendant explained the victim's death; at some point, Ms. Ixpata suggested, "maybe she choked." Ms. Ixpata noted that the Defendants said "[t]hat if the baby could come out from the hospital they were going to take her to Guatemala" to bury her. Ms. Ixpata said that she never noticed either Defendant abusing the victim and had no reason to believe there was anything wrong with the victim.

Mr. Garcia testified that he worked at La Hacienda in March 2007 and confirmed that he shared an apartment with the Defendants, the victim, Mr. Sontay, and Ms. Ixpata. He had not known the Defendants before they moved in. Mr. Garcia slept on the living room couch. He said he saw the Defendants and the victim together on two occasions: when they moved in about a week before the victim's death, and on February 28, the Wednesday before the victim's death.

On March 2, Mr. Garcia left for work at about 11:00 a.m., returning home with Mr. Sontay between 9:30 and 10:00 p.m. He did not see the Defendants or the victim at that time, but noticed that their bedroom door was closed. Eventually, he went to sleep. At about midnight, he heard someone enter the apartment; because of her work schedule, he assumed this person to be Defendant Lopez.

Mr. Garcia woke up at about 8:00 a.m. the next day. Between 8:00 and 10:00 a.m., he did not hear any screams, cries of panic, or other indications that something was wrong. At about 10:00 a.m., while he sat on the living room couch watching television and drinking coffee, Mr. Garcia saw the Defendants exit their bedroom holding the victim; they did not ask for help, and they hurriedly left the apartment. He did not see the Defendants closely and therefore could not say whether either was crying or speculate regarding their mental state at the time. Later that day, Mr. Garcia learned that the victim had died. Mr. Garcia said that he never noticed anything unusual about the victim, never witnessed any abuse, and never heard any suspicious noises from the Defendants' and victim's bedroom.

Registered Nurse Christine Jett testified that she was working in the Baptist emergency room on March 3. That morning, she saw an emergency medical technician carrying the victim into the emergency room. Nurse Jett followed the technician into a trauma room, where she tried CPR. She immediately realized that the victim's body was stiff

and cold. She notified Dr. Stanley Meers. Later, at Dr. Meers' direction, Nurse Jett notified the MNPD and the medical examiner ("ME") of the victim's death. Nurse Jett never spoke to the Defendants and did not obtain the victim's medical history. She acknowledged that she responded "no" on a computerized form to the question, "Are there any bruises or marks or injuries that appear to be inconsistent with the story?" She said she had noticed some mottling on the victim, however, and merely answered this question "no" because she had not been given any explanation with which the victim's injuries could have been inconsistent.

Dr. Meers testified that, on March 3, he worked in the emergency room at Baptist. He first came into contact with the victim when he saw her being carried into a patient room; she had been admitted at 9:57 a.m. He entered the room and began to examine the victim; her skin color and pupil appearance, as well as the absence of spontaneous respiration, led Dr. Meers to believe the victim was dead. A closer exam revealed the onset of early rigor mortis and the absence of heart sounds, respiration, and cardiac activity. Dr. Meers noted that the victim's body had a rectal temperature of eighty-four degrees Fahrenheit. Dr. Meers estimated, based on this temperature, that the victim had been dead for four to six hours. He pronounced the victim dead at about 10:00 a.m.

Aided by pictures taken at the scene, Dr. Meers testified regarding certain marks he observed on the victim's body. First, he noted an area of redness below the left corner of her mouth, some discoloration in the middle of her forehead, and some redness around her nose. He had not noticed those markings at the time, however; he first saw them in the pictures the State introduced into evidence. He did notice bruising on her middle-left torso area, as well as some dark mottling and linear striations on her back. Dr. Meers could not say whether these striations were bruises or simply the settling of the victim's blood. He said that none of the marks he observed could have been caused by any hospital procedure, and also would not have been caused by the CPR Defendant Gomez said he attempted at about 9:30 a.m. Although Dr. Meers was sure that the victim had bruises on her torso, he could not conclude at that time that the bruises were caused by child abuse. He did not investigate whether the victim sustained any internal injuries.

Dr. Meers noted that the pictures to which he referred in his testimony were taken by the police at about noon, and that the bruising shown therein was less noticeable at 10:00 a.m. Dr. Meers recorded sudden infant death syndrome, trauma, and "other disease" as possible causes of the victim's death. In accordance with Tennessee law, Dr. Meers arranged to have the MNPD and the ME informed about the victim's unexplained death.

ME Investigator Burton Mixer testified that he responded to Baptist on the morning of March 3, arriving between 10:45 and 11:00 a.m. Detective Martin Rivera arrived shortly thereafter and acted as a translator, which allowed Investigator Mixer to speak with the

Defendants. Investigator Mixer began by asking the Defendants questions related to filling out a standard sudden unexplained infant death investigation ("SUIDI") form.

After identifying themselves as the victim's parents, the Defendants relayed to Investigator Mixer that they and the victim lived in a single room in a rented apartment. Defendant Lopez said she had last seen the victim alive early that morning when she returned home from work at about midnight: the victim had been asleep in the bed next to Defendant Gomez. Defendant Gomez said the victim had last been fed at about 10:00 p.m. on March 2, at which time she drank six ounces. The victim drank from a bottle while lying on her side with a bottle in her mouth. Defendant Gomez said he had propped up the bottle against a rolled up blanket to steady it for the victim. Investigator Mixer said this position was not dangerous.

Defendant Lopez said she woke up at about 9:00 a.m. This was unusual because the victim usually woke up for a feeding at about 5:00 a.m. At that time, Defendant Lopez observed the victim lying unresponsive on her back. Defendant Lopez said she woke up Defendant Gomez, who attempted "light chest compressions" before driving to Baptist. Investigator Mixer said that, in his experience, the fact that the Defendants drove the victim to Baptist rather than calling 911 was "[n]ot significant. A little out of the ordinary but not significant."

Investigator Mixer conducted a brief examination of the victim's body, noticing evidence of bruising to the victim's sternum and to the back of her torso. He took pictures of the victim's body. At about 12:30 p.m. on the same day, Investigator Mixer, Det. Bruner, and MNPD YSD Det. Thomas Bowden accompanied the Defendants to their residence, where they reenacted the victim's position when she was last seen alive by using a doll. Investigator Mixer noted that the Defendants' living conditions were "small and cluttered" but not unhygienic or dangerous.

Detective Bowden testified that he also responded to Baptist on the morning of March 3. He attempted to gather family and medical history from the Defendants, as well as an account of the victim's last seventy-two hours. He also noticed some bruising on the victim. He said the Defendants' demeanor at the hospital seemed appropriate under the circumstances, and that they were cooperative.

Detective Bowden testified, somewhat confusingly, that during the investigation of their residence the Defendants told him that Defendant Lopez had been "bathing [the victim] the day before, and the father of the child was – immediately started showing me that the child was moving up and down real – his arms up and down real hard and that the mother had to grab the child when the child was falling and that that may have been the cause for the

-7-

bruising that I was speaking of." Defendant Gomez was apparently not present for this bath, however, and was instead "demonstrating what the child was doing."

Detective Bowden said that he and Det. Bruner met the Defendants at the funeral home where the victim's body had been taken on Sunday, May 4. They interviewed the Defendants that evening at the MNPD and arrested them the next day.

Detective Bruner also testified that she responded to Baptist on March 3, arriving around noon to find Investigator Mixer and Officer Rivera attempting to fill out the SUIDI form. She proceeded to interview the Defendants, recording their answers with a portable voice recorder. She also examined the victim and took a number of pictures that the State introduced into evidence. She observed two "reddish purplish color bruises right below the breast area." She also saw some apparently older bruises slightly under this first set. Detective Bruner saw more bruises on the victim's back and spine, near her waist. As for the injuries around the victim's nose and mouth, Defendant Lopez told Det. Bruner that the victim had scratched herself and that she had put mittens on the victim in order to prevent further injury.

Detective Bruner, Det. Bowden, and Investigator Mixer later accompanied the Defendants to their residence, where Det. Bruner took a few reenactment photos. She learned that the Defendants and the victim all slept in one bed. The victim typically slept on the left side of the bed, while Defendant Lopez slept in the middle of the bed and Defendant Gomez slept on the right side. Detective Bruner interviewed the apartment's other residents.

The victim's autopsy was conducted on March 4; thereafter, the victim's body was transported to a funeral home. Detective Bruner, having learned the results of the autopsy, met the Defendants at the funeral home on March 4 and asked them to come to the MNPD for questioning. They did so. Detective Bruner had also received a call from Reed Van Ness, the embalmer responsible for preserving the victim's remains, informing her that both of the Defendants were planning to return to Guatemala with the victim. Mr. Van Ness also informed Det. Bruner that the Defendants planned to return to the funeral home later on March 4.

The Defendants' interviews concluded in the early morning hours of March 5, at which time both Defendants were arrested. The interviews were recorded and played for the jury. After the arrests, Det. Bruner spoke to Josefina and Jamie Lopez at the Defendants' previous residence.

Detective Bruner noted that Defendant Lopez consistently said that she had no knowledge of the victim's injuries or the cause of her death. Detective Bruner also learned

that Defendant Lopez had worked at a Taco Bell inside of Vanderbilt University Medical Center ("VUMC"); she obtained Defendant Lopez's time card from the relevant period of time. The time card showed that Defendant Lopez arrived at work at 4:02 p.m. on March 2 and left at about 12:15 a.m. on March 3. Detective Bruner remembered that a supervisor told her that Defendant Lopez had actually left at about 12:25 a.m. on March 3. She estimated that the Taco Bell was about fifteen to twenty minutes away from the Defendants' residence.

Dr. Adele Lewis, a qualified forensic pathologist with the Davidson County Medical Examiner's office, performed the victim's autopsy. Because of the victim's injuries, she requested a consultation with Dr. Mark Becher, a VUMC specialist in neuropathology, and integrated some of Dr. Becher's resulting report into her testimony. Dr. Lewis introduced into evidence a number of photos taken during the victim's autopsy.

Dr. Lewis explained that she first documented the victim's external injuries and obtained an X-ray image of each of the victim's bones. Dr. Lewis observed abrasions around the victim's nose, near the corner of her mouth, and on the right side of her chin. They appeared to have been inflicted at or around the time of the victim's death, meaning that they were inflicted three to six hours before death. They did not appear to be fingernail scratches. Dr. Lewis said that there were "many different ways [the victim's facial injuries] could have been caused, as many ways as you could possibly come up with." She also said the injuries were consistent with an adult hand covering the victim's nose and mouth.

Dr. Lewis also observed small, round bruises in the middle of the victim's chest and additional bruises on the lower left side of the victim's chest, under which fresh blood had pooled in the victim's soft tissue. The victim also showed bruising on her back. These bruises appeared to have been inflicted at or around the time of the victim's death and, along with the victim's facial abrasions, would have been immediately visible after infliction. Dr. Lewis said that these bruises, taken in the aggregate, appeared to be "fingertip bruises" created "when a person is grasped tightly." Also consistent with this type of grasping were "[f]resh fractures of several of the ribs on the left side." Dr. Lewis also noticed two older, calloused fractures: one was evident on the seventh rib on the victim's back right side and another was evident on the eleventh rib on the victim's back left side. Dr. Lewis said that such callouses take ten to fourteen days to grow around a fractured bone, and estimated that these injuries occurred fourteen to twenty-eight days before the victim's death, meaning sometime in February 2007.

Dr. Lewis also found fractures of the fourth, fifth, sixth, and seventh ribs on the victim's back left side. These fractures were inflicted at or around the time of the victim's death, and corresponded to the bruising evident from external examination of the victim.

Dr. Lewis testified that rib fractures are "particularly indicative of child abuse or of shaking type injuries or grasping type injuries." The victim's fractures were consistent with grasping by adult hands with the victim facing the adult. These injuries were consistent only with child abuse or "a severe car accident," as a great deal of force is required to fracture an infant's ribs. Dr. Lewis said that an adult using the required amount of force would be aware that their conduct was likely to cause injury.

Dr. Lewis also found injuries to and bleeding around the jejunum area of victim's small intestine, as well as similar injuries to the mesentery, the area that attaches the small intestine to the rest of the body. These injuries could not have been caused by squeezing or shaking, and would have required "a significant amount of force" to inflict. They were inflicted at or around the time of the victim's death. Although they were not immediately fatal, they could have caused a blockage of the small intestine and could have caused the victim's death after a few days.

Dr. Lewis also found evidence of an injury to the victim's head. The victim had a small bruise under the left side of her scalp as well as some bleeding in the area around the coverings of her brain and on the surface of her brain. This injury was likely caused by some impact, and would have required a significant amount of force; it could not have resulted, for instance, from the victim falling off a table.

In summary, Dr. Lewis found evidence of four different types of injury: (1) recent injuries to the victim's face; (2) recent and older shaking-type injuries to the victim's torso and ribs; (3) a recent blow to the head; and (4) a recent intestinal injury. None of these injuries were consistent with accidental trauma or resuscitative efforts; all were consistent with child abuse.

Dr. Lewis said that a body, generally speaking, loses one to two degrees Fahrenheit of body temperature per hour after death. The temperature of the victim's body upon arrival at Baptist was eighty-four degrees; Dr. Lewis estimated that the victim had been dead for a minimum of four hours, but probably closer to six hours. Lividity and rigor mortis begin thirty to 120 minutes after death.

Dr. Lewis noted that the victim's stomach contents were not inconsistent with Defendant Gomez's report that the victim had drank four ounces of formula at about 9:30 p.m. on March 2. Finally, Dr. Lewis identified the victim's cause of death as "multiple blunt force injuries" and the victim's manner of death as "homicide."

Dr. Lewis also offered a number of conclusions based on the results of Dr. Becher's neuropathology exam; we will first discuss his testimony, however. Dr. Becher said that he

conducted a specialized study of the victim's brain injuries in response to evidence of shaken baby syndrome. He found several abnormalities in the victim's brain. First, he found "focal acute hemorrhages underneath the lining that goes over the brain." These hemorrhages appeared on the middle left side of the brain, and corresponded with the bruise Dr. Lewis found under the left side of the victim's scalp. Dr. Becher also found a "[f]ocal subarachnoid acute hemorrhage" related to the same impact event but present under a different layer of brain covering. Next, Dr. Becher found evidence of an older hemorrhage on the victim's dura, as well as an older disruption of some ventricle lining in the victim's brain.

Dr. Becher also found "shearing injury," which is symptomatic of shaken baby syndrome. He explained that brain cells called neurons normally transport proteins down their processes, called axons. Shearing injury prevents such transportation from occurring and results in brain swelling. Dr. Becher microscopically examined a portion of the victim's brain, finding shearing in the "large white matter structure that crosses from one side of the brain to the other . . . called the corpus callosum." Dr. Becher said that shearing damage in one portion of the brain generally indicated damage to other parts of the brain as well. The corpus callosum evidenced both old and new shearing damage; the older damage was much less severe. Dr. Becher also found fresh hemorrhages in the muscles behind the victim's eyes.

Dr. Becher noted that he was able to see swelling in the victim's brain without the use of special microscopic studies. Certain areas of swelling were subacute, meaning that they were anywhere from eighteen hours to three weeks old at the time of the victims' death; others were newer and still acute. Dr. Becher said that acute swelling takes two to four hours to appear after an injury, meaning that the victim would have remained alive for at least that long after being injured. Dr. Becher also noticed a neuron color change due to oxygen deprivation in some areas of acute swelling; he said that this color change takes three to six hours to develop after an injury.

Despite the minimum three to six hour period of survival implied by the color change in the victim's neurons, Dr. Becher said the injuries the victim sustained at or around the time of her death were fatal and that the victim would not have recovered even had she received prompt medical attention. Dr. Becher said that he could not precisely age the constellation of injuries that caused the victim's death; he said, however, that they were at least three hours old but could not have been more than eighteen hours old.

Dr. Becher said that the victim would not have appeared normal during the period of survival after her fatal injuries; she would have exhibited noticeable signs of distress, including difficulty breathing. Having examined Dr. Becher's neuropathology report, Dr. Lewis testified that the victim's injuries might also have caused unconsciousness and

-11-

seizures. She said there "definitely" would have been some sign of injury, and agreed that the victim would have had trouble breathing. She said it was "conceivable," but not likely, that the injured victim would have appeared normal to a non-culpable third party.

Mr. Van Ness testified that he embalmed the victim and otherwise prepared her remains, after being initially contacted by Defendant Lopez's brother, Jamie. He noted that the victim's remains had been autopsied. The Defendants told Mr. Van Ness that they both planned to return to Guatemala with the victim's body.

Mr. Van Ness explained that his funeral home, Affordable Alternatives, specialized in serving Hispanic immigrant families who have lost love ones; Mr. Van Ness noted that he had prepared remains in forty-nine Hispanic deaths in 2006. He testified that he had therefore gained some familiarity with the customs and traditions of first-generation Hispanic immigrants. He estimated that such families arranged to send the deceased's body back to his or her home country about ninety percent of the time, generally along with one relative. In Mr. Van Ness' experience, it was very unusual for both parents to wish to return to the home country with a deceased child; because the parents had typically come to the United States for economic reasons, they could not afford to leave simultaneously. Mr. Van Ness also said that Defendant Gomez seemed "aggressive" about getting both the victim and himself out of the United States. Eventually, the MNPD contacted Mr. Van Ness and instructed him not to ship the victim's body.

At the end of the State's evidence, the Defendants moved for judgments of acquittal. The trial court denied these motions. Defendant Gomez declined to testify or put on proof.

Defendant Lopez chose to testify in her own defense. She said she was from a poor family in Guatemala and had come to the United States with Defendant Gomez when she was sixteen years old. When she was eighteen years old, she found out she was pregnant. She was happy because she wanted children. She arranged for prenatal care while she was pregnant.

The victim was extremely important to Defendant Lopez, who declined to take the victim to day care because she was afraid of leaving the victim with a stranger who might harm her. Instead, the Defendants arranged to work at different times so that one of them could always be home with the victim. Defendant Lopez said that she knew nothing about the victim's injuries until a detective told her about them.

Defendant Lopez testified that the victim was happy and healthy on the morning of March 2. Defendant Lopez left for work at about 4:30 p.m. on that day; only the victim and Defendant Gomez were in the apartment at that time. She arrived at Taco Bell shortly

thereafter, where she cleaned and served food for around $200 per week. Because one of her coworkers did not show up, Defendant Lopez worked until about 12:30 a.m. on March 3. She was tired when she got home and went to bed about five minutes after arriving. The victim was asleep, as she normally was at that time. Defendant Lopez did not touch the victim, and said the victim "was breathing fine."

Defendant Lopez said that the victim normally woke up for a feeding between 4:00 and 5:00 a.m. and would fall back to sleep afterward. She would then wake up with the Defendants between 8:00 and 9:00 a.m. The victim did not wake up between 4:00 and 5:00 a.m. on the morning of March 3, however. Defendant Lopez did wake up, briefly, at about 5:00 a.m.; half-awake, she assumed the victim was still sleeping and continued to sleep herself. Defendant Lopez did not notice any difficult breathing on the victim's part.

Defendant Lopez woke up again between 9:00 and 10:00 a.m. She knew something was wrong because the victim had not yet woken up. Defendant Lopez picked up the victim and knew the victim was dead. Unable to accept the victim's death, she woke up Defendant Gomez and told him to drive them to the hospital.

Defendant Lopez said that she had never noticed any injuries on the victim and did not realize anything was physically wrong with her until a detective told her about the bruising on the victim's body. Defendant Lopez had never seen Defendant Gomez mistreat the victim; if she had, she would have called the police and filed a complaint. Had she noticed any bruises or markings on the victim on March 2, she would have taken the victim to a doctor.

On cross-examination by counsel for Defendant Gomez, Defendant Lopez said she previously had not believed Defendant Gomez would have hurt the victim; at the time of trial, she did not know what to believe and could not understand how the victim had sustained her injuries:

[Defendant Gomez's Counsel]: Would you say that you knew [Defendant Gomez] well?

[Defendant Lopez]: Yes.

[Defendant Gomez's Counsel]: Did you ever think he could hurt his own daughter?

[Defendant Lopez]: No.

. . . .

[Defendant Gomez's Counsel]: Do you think he could hurt her today at this moment in time?

[Defendant Lopez]: I don't know what to believe. I can just tell you that I cannot believe she had that [her injuries]. I cannot accept this.

After this testimony, the State requested permission from the trial court to question Defendant Lopez about prior instances of domestic violence between her and Defendant Gomez. The trial court allowed this testimony, concluding that Defendant Lopez had "opened the door" by testifying that she had no reason to think that Defendant Gomez might hurt the victim. The trial court also found that Defendant Gomez had "opened the door" by asking Defendant Lopez whether she ever thought Defendant Gomez "could hurt his own daughter."

Defendant Lopez's testimony continued. She agreed that no one but her and Defendant Gomez cared for the victim and that no one else could have hurt the victim. When asked why she and Defendant Gomez stopped living with her sister, Defendant Lopez initially said they "wanted to be more comfortable." After additional questioning, she admitted that her brother and sister had a problem with Defendant Gomez because the Defendants had argued about "some gossip." During the argument, Defendant Gomez had "head-butted" Defendant Lopez, who had called the police, filed a report, and requested an order of protection. These events occurred on February 20, 2007.

Defendant Lopez acknowledged that she could have stayed with her siblings and forced Defendant Gomez to leave. She said, however, that she and Defendant Gomez resolved their dispute and that Defendant Gomez had never been violent to her before or since:

[The State]: Now, when Detective Bruner questioned you on March 4th of 2007, she asked you if [Defendant] Gomez had ever hit you, correct?

[Defendant Lopez]: Yes.

. . . .

[The State]: Did you tell Detective Bruner that [Defendant] Gomez did not hit you when she asked that question?

[Defendant Lopez]: Yes, because she was referring to [Defendant Gomez] mistreating me.

[The State]: Didn't he mistreat you?

[Defendant Lopez]: The only time was when I called the police.

In response to that statement, the State asked Defendant Lopez whether she had told a Taco Bell coworker, Martha Soto, that she and Defendant Gomez fought frequently. She admitted that she had, but said she had done so in order to make Ms. Soto, who suffered through constant marital discord, feel better.

Defendant Lopez acknowledged telling Ms. Soto, in January 2007, that Defendant Gomez had kicked her in the side and caused bruises. Defendant Lopez noted that she had never showed the supposedly injured area to Ms. Soto, however, and implied that Defendant Gomez had not kicked her in the side. Defendant Lopez also admitted that she had told Ms. Soto, apparently truthfully, that Defendant Gomez had at some point hit her with a belt buckle. The State also attempted to impeach Defendant Lopez's credibility by asking additional questions about whether she had denied, in her March 4 interview with Det. Bruner, that Defendant Gomez had ever been violent toward her:

[The State]: Officer Fernandez asked you in Spanish, "Has he ever hit you?"

[Defendant Lopez]: Yes.

[The State]: And your answer was, "Um, yes. No, no. He didn't – didn't hit me like that, like to hit me." That was a lie, wasn't it.

[Defendant Lopez]: No, because he wasn't hitting me.

. . . .

[The State]: And when they asked you a direct question, whether [Defendant Gomez] has ever hit you, you say no?

[Defendant Lopez]: Yes.

[The State]: That was a lie because he hit you two times.

[Defendant Lopez]: I explained to the police officer that was translating about the call I had made to the police when [Defendant Gomez] had hit me in the head.

[The State]: [Defendant Lopez], I've looked through the transcript. There's only one time the police asked you about [Defendant Gomez] hitting you, and you never admitted that he hit you.

. . . .

[The State]: The one time that Officer Fernandez and Detective Bruner asked you if [Defendant Gomez] hit you during that two[-]and[-]a[-]half[-]hour interview you said no, isn't that right?

[Defendant Lopez]: Yes.

[The State]: So you lied to cover up or conceal your husband's conduct when you're being questioned in a homicide?

[Defendant Lopez]: No.

. . . .

[The State]: Why would you think about lying to the detective in that circumstance?

[Defendant Lopez]: At the time I wasn't thinking about that.

. . . .

[The State]: And when Detective Bruner asked you for help in doing her job on behalf of your baby, you lied to her?

[Defendant Lopez]: I didn't lie to her. At the time I was very hurt, and I didn't even realize what I was saying.

The State also asked Defendant Lopez whether she had told Ms. Soto that Defendant Gomez once violently pinched the victim's leg in an effort to punish her for crying. Defendant Lopez denied this, and explained that the victim had been irritable after receiving a vaccination shot on January 17, 2007. Defendant Lopez said she told Ms. Soto that

-16-

Defendant Gomez had gently massaged the victim's leg around the area of the shot. Defendant Lopez added that Ms. Soto was a generally untrustworthy person.

Defendant Lopez also admitted that her sister Josefina told her to protect the victim from Defendant Gomez. Defendant Lopez believed, however, that Defendant Gomez would not hit her again after he apologized for head-butting her. She admitted that since their arrests on March 4, she and Defendant Gomez had exchanged over one hundred love letters.

Ms. Soto briefly testified for the State in rebuttal. She said she had told Defendant Lopez that Defendant Gomez, having hurt her, might also hurt the victim. She also said that Defendant Lopez told her that Defendant Gomez "had given [the victim] a little swat on the backside because she was crying a lot" after being vaccinated.

The Defendants were convicted as previously summarized. They now appeal.

## Analysis

### I. Sufficiency of the Evidence

Both Defendants contend that the State presented evidence insufficient to convict them. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh

or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

Because no eyewitness testified regarding the identity of the perpetrator of the crimes in this case, we note that

> the law is firmly established in this State that to warrant a criminal conviction upon circumstantial evidence alone, the evidence must be not only consistent with the guilt of the accused but it must also be inconsistent with his innocence and must exclude every other reasonable theory or hypothesis except that of guilt, and it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that he is the one who committed the crime.

Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. Crim. App.1970). "The inferences to be drawn from [circumstantial] evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." Id. at 391 (quoting Marable v. State, 313 S.W.2d 451, 452 (Tenn. 1958)).

After the State's election of offenses, the trial court instructed the jury to consider the conduct underlying each count of the indictment as follows:

For [C]ount [O]ne, felony murder during the perpetration or attempted perpetration of aggravated child abuse: "The [D]efendant(s) caused head trauma involving bleeding into the brain, damage to the axons of the brain, and brain swelling which later caused the death of [the victim] on or about March 3, 2007."

For [C]ount [T]wo, felony murder during the perpetration or attempted perpetration of aggravated child neglect: "The [D]efendant(s) caused head trauma involving bleeding to the brain, damage to the axons of the brain, and brain swelling and then failed to seek immediate medical attention for her injuries which later caused the death of [the victim] on or about March 3, 2007."

For [C]ount [T]hree, aggravated child abuse: "The [D]efendant(s) caused multiple acute rib fractures to [the victim] on or about March 3, 2007."

For [C]ount [F]our, aggravated child abuse: "The [D]efendant(s) caused blunt abdominal trauma, consisting of jejunal and mesenteric bleeding to [the victim] on or about March 3, 2007."

For [C]ount [F]ive, aggravated child abuse: "The [D]efendant(s) caused two rib fractures and prior brain injury to [the victim] on a day in February 2007 which were discovered at the time of autopsy and showed evidence of healing indicating they had occurred at least a week earlier than March 3, 2007."

### A. Defendant Gomez
Defendant Gomez was convicted as charged of Counts One through Five. He appeals the sufficiency of the evidence supporting each conviction.

#### i. Motion for Judgment of Acquittal
Defendant Gomez appears to argue that the trial court should have directed a verdict on his behalf after the close of the State's proof. Directed verdicts have been abolished in Tennessee, however. See Tenn. R. Crim. P. 29(a). Defendant Gomez might instead argue that the trial court should have granted him a judgment of acquittal; in choosing to cross-examine Defendant Lopez, however, he failed to stand on his motion. He has thus waived this issue. See Finch v. State, 226 S.W.3d 307, 316 (Tenn. 2007) (citation omitted); see also Mathis v. State, 590 S.W.2d 449, 453 (Tenn. 1979) (stating that a petitioner had waived appellate review of his motion for acquittal by "[failing] to close his case at the conclusion of the State's proof and by participating in the trial by the cross-examination of his co-defendant").

#### ii. Aggravated Child Abuse
A person commits aggravated child abuse, as applied to the facts of this case, who "commits child abuse . . . and: (1) the act of abuse . . . results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a). A person commits simple child abuse who "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." Tenn. Code Ann. § 39-15-401(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

##### a. February 2007
During the victim's autopsy, Dr. Lewis found two calloused rib fractures that she estimated to be between fourteen and twenty-eight days old at the time of the victim's death. Dr. Becher found evidence of older shearing injury to the victim's brain, as well as subacute swelling that he estimated to be between eighteen hours and three weeks old at the time of the victim's death. Because rib fractures and shearing injury are consistent with shaken baby syndrome, this evidence is sufficient to establish that the victim was shaken between fourteen and twenty-eight days before her death.

We conclude, however, that the evidence is not sufficient to establish Defendant Gomez's identity as the perpetrator of the February 2007 shaking injury. No direct or circumstantial evidence established the events surrounding this injury. During that month, the Defendants lived with Defendant Lopez's sister, her husband, and their brother. No testimony established whether other possible perpetrators visited their residence or whether the victim was in the sole care of Defendant Gomez at the time she was injured. Although we acknowledge that the evidence establishing the circumstances of the victim's later, fatal injuries might understandably lead one to believe that Defendant Gomez also inflicted the victim's earlier injuries, this paucity of evidence simply does not "exclude every other reasonable theory or hypothesis except that of guilt." Pruitt, 460 S.W.2d at 390. We accordingly reverse and vacate Defendant Gomez's Count Five conviction of aggravated child abuse.

### b. March 2-3, 2007

Both Dr. Meers and Dr. Lewis established that the victim died between four and six hours before her body's arrival at Baptist, meaning that she died between 4:00 and 6:00 a.m. on March 3. Dr. Lewis estimated the time of death at closer to six hours before 10:00 a.m. Dr. Becher established a minimum survival time of three to six hours after her injury; combining both estimates, this establishes that the victim was injured sometime between 10:00 p.m. on March 2 and 3:00 a.m. on March 3. Crediting Dr. Lewis' more likely 4:00 a.m. time of death, the victim was injured between 10:00 p.m. on March 2 and 1:00 a.m. on March 3.

Each of the Defendants' housemates testified that the Defendants were home during this time frame. Each of their housemates also testified that the Defendants were the victim's exclusive care providers. Testimony established that Defendant Gomez was alone in the room he shared with the victim and Defendant Lopez until Defendant Lopez returned from work; Defendant Lopez said she left work at about 12:30 a.m. on March 3. Detective Bruner estimated that Defendants lived between fifteen and twenty minutes away from VUMC, meaning that Defendant Lopez returned home between 12:45 and 12:50 a.m.

This evidences thus supports the conclusion that Defendant Gomez was the only person with the victim during all but ten to fifteen minutes of the time period in which the victim was injured. Further, Defendant Lopez testified that she did not physically abuse the victim and that no one else but she and Defendant Gomez cared for the victim. Although it is clear that the State challenged Defendant Lopez's credibility on other matters at issue in this case and that the jury, in convicting her, disbelieved some of her testimony, "the jury is free to believe portions of a witness' testimony and to disbelieve other portions." State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citation omitted).

Dr. Lewis testified that an adult causing the victim's injuries would have been aware that his or her conduct was injurious and that the victim's rib fractures could not have been caused by the same action which caused her mesenteric and jejunal bleeding. Finally, medical testimony established that the victim's injuries could only have been caused by child abuse or a major traumatic event like a car accident. No testimony evidenced any such event.

This evidence is both consistent with Defendant Gomez's guilt and inconsistent with his innocence. See Pruitt, 460 S.W.2d at 390. It shows that the victim non-accidentally sustained multiple rib fractures and blunt abdominal trauma at a time when she was alone in a room with Defendant Gomez. It also shows that Defendant Gomez could not have caused these injuries unknowingly. See Tenn.Code Ann. § 39-11-302(b). We conclude that the evidence is sufficient to convict Defendant Gomez of Counts Three and Four.

### iii. Felony Murder

The Defendant next challenges the sufficiency of the evidence convicting him of felony murder. Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2).

There is no dispute that the victim died as a result of the injuries she sustained on or about March 3. We have concluded that the evidence is sufficient to convict Defendant Gomez of inflicting multiple rib fractures on the victim; the evidence showed that the same conduct "caused [the] head trauma involving bleeding to the brain, damage to the axons of the brain, and brain swelling" charged in Count One. The proof therefore supports the Defendant's conviction of felony murder during the perpetration of aggravated child abuse.

It is also sufficient to convict the Defendant of felony murder during the perpetration of aggravated child neglect. A person commits aggravated child neglect, as applied to the facts of this case, who "commits child neglect . . . and: (1) the act of neglect . . . results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a). A person commits simple child neglect who "knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare." Tenn. Code Ann. § 39-15-401(b). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). Medical testimony established that the seriousness of the victim's injuries would have been obvious to an observer; despite the evident severity of the victim's injuries, Defendant Gomez failed to seek prompt medical attention, eliminating any chance of saving the victim.

We have concluded that the State presented evidence sufficient to convict Defendant Gomez of Counts One through Four. We have concluded that the State presented insufficient evidence to convict him of Count Five, and accordingly vacate that conviction and sentence.

**B. Defendant Lopez**

Under Counts One and Two, Defendant Lopez was convicted of the lesser-included offense of facilitation of first degree murder. She was convicted as charged of the allegations of aggravated child abuse contained in Counts Three and Four, those counts arising from conduct occurring on or about March 3, 2007. She was found not guilty of the allegation of aggravated child abuse contained in Count Five, that count arising from conduct occurring in February 2007.

**i. Aggravated Child Abuse**

Again, a person commits aggravated child abuse, as applied to the facts of this case, who "commits child abuse . . . and: (1) the act of abuse . . . results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a). A person commits simple child abuse who "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." Tenn. Code Ann. § 39-15-401(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

The evidence at trial was not sufficient to show that Defendant Lopez actually inflicted the victim's injuries. We must therefore evaluate the sufficiency of the evidence of aggravated child abuse under a theory of criminal responsibility, on which the jury was instructed by the trial court. Tennessee statutes provide that a person is "criminally responsible for an offense committed by the conduct of another if: [A]cting with intent to promote or assist the commission of the offense, or to the benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). This statute codifies the longstanding common law theories of "accessories before the fact and aiders and abettors." Tenn. Code Ann. § 39-11-402, Sentencing Commission Comments. However, criminal responsibility is not itself a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999).

A defendant may be criminally responsible for the crime of another when, "having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the [defendant] fails to make a reasonable effort to prevent commission of the offense." Tenn. Code Ann. § 39-11-402(3). A parent has a duty imposed by law to

"protect [his or her child] from harm and provide [him or her] with emergency attention." State v. Hodges, 7 S.W.3d 609, 623 (Tenn. Crim. App. 1998) (citations omitted).

Defendant Lopez was acquitted of the February 2007 incident of aggravated child abuse charged in Count Five; she was convicted of criminal responsibility for Defendant Gomez's infliction of multiple rib fractures as well as abdominal trauma to the victim on March 2 or 3, 2007. We conclude that the evidence is sufficient to show that Defendant Lopez failed to make a reasonable effort to prevent the commission of the two acts of aggravated child abuse charged in Counts Three and Four because she failed to protect the victim from harm by providing emergency medical attention. Medical testimony uniformly established that the victim could not have sustained her injuries without entering a state of noticeable medical distress thereafter. The proof established that Defendant Lopez slept next to and in the same bed with the victim. Any rational juror could have believed that, when she returned home at about 1:00 a.m., Defendant Lopez would have noticed the victim's injuries or the fact that she was having difficulty breathing. Any rational juror also could have believed that, upon waking up at 5:00 a.m., Defendant Lopez would have noticed either that the victim had died, because the victim was estimated to have died between 4:00 and 6:00 a.m., or the victim's continued breathing difficulty. Defendant Lopez took no action. As in Hodges, "[t]his proof is sufficient for the jury to infer [Defendant Lopez's] intent to promote or assist in the infliction of injury or neglect of the child." Id. at 624. Although we note Defendant Lopez's claim that she observed the victim upon returning home and upon waking up and noticed nothing wrong, the jury obviously chose not to credit this testimony. This issue is without merit.

### ii. Facilitation of First Degree Murder

Defendant Lopez was convicted of one count of facilitation of felony murder during the perpetration of aggravated child neglect and one count of facilitation of felony murder during the perpetration of aggravated child abuse. The trial court merged the two convictions.

Tennessee Code Annotated section 39-11-403(a) outlines the general requirements for conviction of facilitation of a felony, stating that "[a] person is criminally responsible for facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." We have applied this section to the specific felony of facilitating felony murder:

Facilitation of felony murder requires proof that:

(1) One of the felonies listed in Tennessee Code Annotated section 39-13-202(a)(2) or (3) was committed;

(2) The victim was killed during the commission of that offense;

(3) The defendant knew that another person intended to commit the underlying felony, but he or she did not have the intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense; and

(4) The defendant knowingly furnished substantial assistance to that person in the commission of the underlying felony.

State v. Jason Lebron Rogers, No. E2007-00354-CCA-R3-CD, 2008 WL 2278514, at *11 (Tenn. Crim. App., Knoxville, June 4, 2008) (citing State v. Margie Jeanette Farley, No. M2003-02826-CCA-R3-CD, 2005 WL 366890, at *9 (Tenn. Crim. App., Nashville, Feb. 16, 2005)).

We have concluded that the evidence sufficiently shows that Defendant Gomez committed felony murder under Counts One and Two, aggravated child abuse and neglect being listed in Tennessee Code Annotated section 39-13-202(a)(2). There is no dispute that the victim died. Elements (1) and (2) of facilitation of felony murder have therefore been established.

### a. Facilitation of Felony Murder – Aggravated Child Neglect

We have previously concluded that the evidence is sufficient to establish that Defendant Lopez became aware of the victim's injuries and did nothing to assist her. The evidence also establishes that she observed Defendant Gomez sleeping next to the injured victim at about 1:00 a.m. and 5:00 a.m., the same times she observed the victim; because medical evidence established that the victim was in an obvious state of distress at these times, Defendant Lopez's knowledge that Defendant Gomez was not offering assistance is sufficient to establish her knowledge that Defendant Gomez intended to commit the underlying felony of aggravated child neglect.

The jury also found that Defendant Lopez acted without "the intent required for criminal responsibility under § 39-11-402(2). More specifically, the jury apparently found that although Defendant Lopez at least "knowingly furnish[ed] substantial assistance" to Defendant Gomez's acts of neglect, she did so while lacking the "intent to promote or assist the commission" of those acts of neglect. See Tenn. Code Ann. §§ 39-11-402(2), -403(a).

We note that Defendant Lopez's convictions of criminal responsibility for aggravated child abuse and facilitation of felony murder are inconsistent in the sense that the former convictions require proof that Defendant Lopez, in ignoring the victim's precarious medical state, had the intent required for criminal responsibility under section 39-11-402(2) and the latter convictions reflect a finding that she did not have that intent. However, we also note that, "[c]onsistency in verdicts for multiple count indictments is unnecessary as each count is a separate indictment," and we "will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned." Wiggins v. State, 498 S.W.2d 92, 93-94 (Tenn. 1973).

### b. Facilitation of Felony Murder – Aggravated Child Abuse

Having previously concluded that the evidence is sufficient to establish that Defendant Lopez is criminally responsible for the conduct of Defendant Gomez for aggravated child neglect, we also conclude that the evidence is sufficient to establish that she facilitated the felony murder of the victim through Defendant Gomez's aggravated child abuse. Although we acknowledge the internal inconsistencies of the jury's verdicts discussed above, we conclude that the evidence presented supports the verdicts of guilt beyond a reasonable doubt.

### II. Testimony Regarding Defendant Gomez's Prior Violent Acts

Both Defendants contend that the trial court erred in allowing the State to cross-examine Defendant Lopez about incidents of domestic violence between her and Defendant Gomez after she responded "no" to Defendant Gomez's counsel's question on cross examination, "Did you ever think [Defendant Gomez] could hurt his own daughter?"

Both Defendants address the admissibility of this evidence under Tennessee Rule of Evidence 404(b), which dictates that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with that character trait." Tenn. R. Evid. 404(b). The State did not seek to cross-examine Defendant Lopez about prior incidents of domestic violence in order to demonstrate that Defendant Gomez had a violent character; it sought to cross-examine Defendant Lopez in order to attack her credibility and demonstrate that she had been warned and therefore knew that Defendant Gomez might be a danger to the victim. In our view, Rule 404(b) is therefore inapplicable.

#### A. Curative Admissibility

On appeal, the State argues that this testimony was admissible under the doctrine of curative admissibility. "This doctrine provides that '[w]here a defendant has injected an issue into the case, the State may be allowed to admit otherwise inadmissable evidence in order to explain or counteract a negative inference raised by the issue defendant injects.'"

State v. Land, 34 S.W.3d 516, 531 (Tenn. Crim. App. 2000) (citing State v. Armentrout, 8 S.W.3d 99, 111 (Mo. 1999)). "[I]n a criminal case, '[t]he rule operates to prevent an accused from successfully gaining exclusion of inadmissible prosecution evidence and then extracting selected pieces of this evidence for his own advantage, without the Government being able to place them in their proper context.'" Id. (citing Lampkins v. United States, 515 A.2d 428, 431 (D.C. 1986)).

Regarding the breadth of the curative admissibility doctrine, this Court explained in Land that

> its applicability is limited by, "the necessity of removing prejudice in the interest of fairness." Crawford v. United States, 198 F.2d 976, 979 (1952) (D.C. Cir. 1952) (citations omitted). It is not an unconstrained remedy permitting introduction of inadmissible evidence merely because the opposing party brought out evidence on the same subject. [People v. Manning, 695 N.E.2d 423, 434 (Ill. 1998)] (citation omitted). The rule is protective and goes only so far as is necessary to shield a party from adverse inferences and is not to be converted into a doctrine for injecting prejudice. Id. (citation omitted). Only that evidence which is necessary to dispel the unfair prejudice resulting from the cross-examination is admissible. United States v. Winston, 447 F.2d 1236 (D.C. Cir. 1971).

Land, 34 S.W.3d at 531-32. "If the trial court decides to admit such testimony on a theory of curative admissibility, however, its decision will not be reversed on appeal unless the appellant can demonstrate a clear abuse of discretion." Id. at 532.

Defendant Lopez contends that her testimony did not "open the door" to evidence of Defendant Gomez's prior violent acts because her testimony "neither asserted nor implied that Gomez was nonviolent." While it is true that Defendant Lopez's testimony did not state that Defendant Gomez had never been violent to her, we cannot agree that the trial court erred in concluding that the testimony implied that Defendant Gomez had a nonviolent nature. While perhaps a close question, we conclude that the trial court did not abuse its discretion in ruling that evidence of Defendant Gomez's prior violent acts tended to call into question Defendant Lopez's testimony that she never thought Defendant Gomez could hurt the victim, especially because this evidence allowed the State to confirm that Defendant Lopez's sister, as well as her coworker, Ms. Soto, told Defendant Lopez that Defendant Gomez was a danger to the victim. The testimony therefore allowed the State to "explain or counteract a negative inference" raised by Defendant Lopez's testimony, Id. at 531 (citing Armentrout, 8 S.W.3d at 111), namely that Defendant Lopez had no reason to believe Defendant Gomez might hurt the victim. It also allowed the jury a more complete set of facts

under which to assess the credibility of Defendant Lopez's testimony and her knowledge of the danger Defendant Gomez may have posed to the victim.

We must also decide whether the admission of evidence of Defendant Gomez's prior violent acts went farther than necessary to cure the unfair prejudice caused by Defendant Lopez's original statement. See Id. at 532. We conclude that it did not. The State inquired about one police-documented incident as well as two other incidents reported by Defendant Lopez's coworker, Ms. Soto. The State's aim was to establish the existence of these three incidents. Defendant Lopez's testimony during the State's cross-examination was prolonged somewhat by her initial insistence that Defendant Gomez had assaulted her only once and by her testimony that she had lied to Ms. Soto about a later incident of domestic violence.

For similar reasons, we agree with the trial court that Defendant Gomez "opened the door" to Defendant Lopez's testimony when Gomez's counsel asked Defendant Lopez if she ever "thought" that Defendant Gomez could hurt the victim. We conclude that the trial court did not abuse her discretion in allowing the State to cross-examine Defendant Lopez regarding her response to this question. This issue is without merit.

### III. Sentencing

Next, both Defendants contend that the trial court erred in sentencing them. On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated

sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

### A. Defendant Gomez

Defendant Gomez's sentencing hearing was held on November 19, 2008. Defendant Gomez made a statement but put on no other proof. His presentence report indicates that, at the time of sentencing, Defendant Gomez was a twenty-eight-year-old Hispanic male. He had one prior conviction, for driving under the influence of an intoxicant in 2006. Defendant Gomez stated that he habitually drank "enough to get drunk" on weekends, but did not drink during the week. Defendant Gomez reported good mental and physical health, and stated that he had attended school in Guatemala through the equivalent of the eighth grade. He reported no employment history.

Defendant Gomez contends that the trial court erred in ordering him to serve his Count Five aggravated child abuse sentence consecutively to his other, concurrent sentences. We previously concluded that the State presented evidence insufficient to convict Defendant Gomez of Count Five. In order to facilitate possible further appellate review, however, we will consider his challenge to his consecutive sentence while assuming, for the purpose of argument, that we have not vacated his Count Five conviction.

Tennessee Code Annotated section 40-35-115(b) lists the criteria a court must use to determine whether a defendant convicted of more than one criminal offense will serve the resulting sentences consecutively or concurrently. The trial court in this case ordered the Defendant to serve his sentences consecutively based on its finding that the Defendant "is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). Although the decision between consecutive and concurrent sentencing lies within the sound discretion of the trial court, see State v. James, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984), "the imposition of consecutive sentences on an offender found to be a dangerous offender requires, in addition to the application of general principles of sentencing, the finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

Our review of the record confirms that the trial court found both Wilkerson prongs applicable to Defendant Gomez. The trial court is thus entitled to a presumption of

-28-

correctness. Pettus, 986 S.W.2d at 543-44. Defendant Gomez solely contends that the second prong is inapplicable given his life sentence and the fact that he has no other children. The evidence at trial did not only show a pattern of violence toward the victim, however; other evidence was sufficient to establish that Defendant Gomez assaulted Defendant Lopez on at least three occasions. The trial court did not abuse its discretion in finding that an extended sentence was necessary to protect the public against further criminal conduct by Defendant Gomez. This issue is without merit.

### B. Defendant Lopez

Defendant Lopez's sentencing hearing was held on November 12, 2008. Defendant Lopez presented the testimony of James Thilgen, the deputy director of the Metropolitan Development and Housing Agency, who established that over the preceding ten or twelve years he had volunteered his time in order to provide jail inmates with "someone to write to or to visit." He testified that he had met with Defendant Lopez about seven or eight times at Correctional Development Center, the site of her incarceration. He noted that Defendant Lopez had used her time in incarceration to learn English and complete a vocational education program in which she and other inmates developed a business plan. Having become aware of Defendant Lopez's upcoming sentencing hearing, Mr. Thilgen contacted defense counsel and arranged to speak on Defendant Lopez's behalf. He also said that Defendant Lopez had assisted other inmates and had become extremely concerned about her sentencing hearing.

Her presentence report indicates that, at the time of sentencing, Defendant Lopez was a twenty-one-year-old Hispanic female. She reported one previous, unverified job in Guatemala, as well as her employment at Taco Bell from December 2006 to March 2007. Defendant Lopez reported "poor" mental health, noting that she had not been eating or sleeping well and had been under the observation of her attorney and jail personnel. She stated that she attended school in Guatemala through the equivalent of the eighth grade. She had no prior criminal record.

Defendant Lopez contends that the trial court erred in setting the length of her sentences. The Defendant's conduct occurred subsequent to the enactment of the 2005 amendments to the Sentencing Act, which became effective June 7, 2005. The amended statute no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. As further explained by our supreme court in Carter,

> the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]." [Tenn. Code Ann.] § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation

to the seriousness of the offense," [Tenn. Code Ann.] § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," [Tenn. Code Ann.] § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," [Tenn. Code Ann.] § 40-35-103(5).

Id. (footnote omitted).

The 2005 Amendment to the Sentencing Act deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered these factors merely advisory, as opposed to binding, upon the trial court's sentencing decision. Id. Under current sentencing law, the trial court is nonetheless required to "consider" an advisory sentencing guideline that is relevant to the sentencing determination, including the application of enhancing and mitigating factors. Id. at 344. The trial court's weighing of various mitigating and enhancing factors is now left to the trial court's sound discretion. Id. Thus, the 2005 revision to Tennessee Code Annotated section 40-35-210 increases the amount of discretion a trial court exercises when imposing a sentencing term. Id. at 344.

To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See id. at 343; State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001). If our review reflects that the trial court applied inappropriate mitigating and/or enhancement factors or otherwise failed to follow the Sentencing Act, the presumption of correctness fails and our review is de novo. Carter, 254 S.W.3d at 345.

Defendant Lopez, as a standard offender convicted of four Class A felonies, faced a sentencing range of fifteen to twenty-five years for each conviction. See Tenn. Code Ann. § 40-35-112(a)(1). The trial court sentenced Defendant Lopez to the maximum of twenty-five years for each conviction based on its finding of the following enhancement factors: that the victim was particularly vulnerable because of age; that Defendant Lopez treated, or allowed the victim to be treated, with exceptional cruelty during the commission of the offense; and that Defendant Lopez abused a position of public or private trust. See Tenn. Code Ann. § 40-35-114(4), (5), (14). The trial court also found the following mitigating factors: that Defendant Lopez, who was nineteen years old at the time of the crimes at issue, lacked substantial judgment in committing the offense; that she assisted the authorities in locating or recovering any property or person involved in the crime; that she acted under the duress or under the domination of another person, even though the duress or domination of another person is not sufficient to constitute a defense to the crime; and as a factor consistent

with the purposes of the Sentencing Act, that Defendant Lopez had difficulty speaking English at the time of the crimes at issue and that she had learned English and assisted other inmates while incarcerated. <u>See</u> Tenn. Code Ann. § 40-35-113(6), (10), (12), (13). The court noted, however, that Defendant Lopez's enhancement factors, particularly the vulnerability of the victim, "far outweigh[ed] any mitigation."

On appeal, Defendant Lopez argues that the trial court erred in finding as an enhancement factor that she allowed the victim to be treated with exceptional cruelty, <u>see</u> Tennessee Code Annotated section 40-35-114(5), and in failing to find as a mitigating factor that she committed her crimes under such unusual circumstances that it is unlikely that a sustained intent to violated the law motivated her criminal conduct. <u>See</u> Tenn. Code Ann. § 40-35-113(11).

We conclude that the trial court, in its discretion, could have ordered Defendant Lopez to serve twenty-five year sentences even if it had not applied the enhancement factor for exceptional cruelty and considered her lack of a sustained intent to violate the law. Our review of the record reflects that the trial court properly considered the principles of the Sentencing Act as well as all relevant facts and circumstances. Defendant Lopez concedes that the trial court applied two other enhancement factors correctly, including the factor on which it placed the most weight: that the victim was particularly vulnerable because of age. <u>See</u> Tenn. Code Ann. § 40-35-114(4). The trial court gave mitigating factors little weight. Under these circumstances, we conclude that the trial court's findings adequately support Defendant Lopez's sentences. This issue is without merit.

## IV. Defendant Lopez's Remaining Points of Error

### A. Exclusion of Non-Citizens from the Jury

Before trial, Defendant Lopez filed a "Motion for a Jury that is Inclusive and Impartial," on which the trial court held a hearing. At the hearing, Defendant Lopez presented proof establishing that persons who are not citizens of the United States are disqualified from serving on Tennessee juries, and that this disqualification excludes approximately two to three percent of otherwise qualified residents of Davidson County. She also presented the testimony of three resident aliens who discussed their cultural backgrounds, their differing cultural perspectives, and their reasons for declining to pursue United States citizenship.

Tennessee Code Annotated section 22-1-101 states that "[e]very person eighteen (18) years of age, <u>being a citizen of the United States</u>, and a resident of this state, and of the county in which the person may be summoned for jury service for a period of twelve (12) months next preceding the date of the summons, is legally qualified to act as a grand or petit

juror." (Emphasis added). Defendant Lopez next contends that the trial court erred in denying her motion and excluding non-citizens from the jury, and attacks section 22-1-101 as violative of the Tennessee Constitution. The trial court held that section 22-1-101 does not violate the Tennessee Constitution.

"[W]hen considering the constitutionality of a statute, courts have a duty to adopt a construction which will sustain the statute and avoid constitutional conflict if at all possible, and this duty requires courts to indulge every presumption and resolve every doubt in favor of the statute's constitutionality." State v. Taylor, 70 S.W.3d 717, 721 (Tenn. 2002).

The constitutionality of section 22-1-101's citizenship requirement is a matter of first impression. Defendant Lopez cites a number of passages from the Tennessee Constitution in support of her argument that the Tennessee Constitution should be read as "properly inclusive and protective of disparate residents of this state" and "as an expansive recognition of the right to be tried by a fair and impartial jury within the county." Among the passages cited by Defendant Lopez, only article I, section 6 explicitly addresses jury qualifications, stating "[t]hat the right of trial by jury shall remain inviolate, and no religious or political test shall ever be required as a qualification for jurors." Our supreme court has stated, however, that

> [a]rticle I, section 6 of our Constitution does not guarantee the right to a jury
> trial in every case . . . . This right has been interpreted to be a trial by jury as
> it existed at common law, or more specifically, "the common law under the
> laws and constitution of North Carolina at the time of the adoption of the
> Tennessee Constitution of 1796." For rights and remedies created after the
> formation of our Constitution, the legislature is free to enact procedures that
> do not include jury trials.

Helms v. Tennessee Dept. of Safety, 987 S.W.2d 545, 547 (Tenn. 1999) (quoting Patten v. State, 426 S.W.2d 503, 506 (Tenn. 1968)). Although this passage addresses the applicability of the right to a trial by jury rather than jury citizenship requirements, we conclude that its reasoning applies in this context. Defendant Lopez does not contend that "the common law under the laws and constitution of North Carolina at the time of the adoption of the Tennessee Constitution of 1796" recognized the right of non-citizens to serve as jurors.

Other jurisdictions have considered the constitutionality of such requirements, typically in response to claims that citizenship requirements for jury service violate the Equal Protection Clause of the United States Constitution, which mandates that "no state . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. In Perkins v. Smith, 370 F. Supp. 134 (D.C. Md. 1974), a three-judge panel of the

United States District Court for the District of Maryland held that citizenship requirements contained in the United States Code and the Annotated Code of Maryland did not violate the Fourteenth Amendment, as the government has a compelling interest

> in assuring that those who make the ultimate factual decisions on issues of personal liberty and property rights under our system of justice be either native born or naturalized citizens, because it may fairly be concluded that as a class they are more likely to make informed and just decisions in such matters than are non[-]citizens.

Id. at 136. "This has been explicitly recognized, by dictum if not by holding, in several Supreme Court cases which have dealt with juror qualifications under the Fourteenth Amendment." Id. at 138 (citing Carter v. Jury Commission, 396 U.S. 320, 332 (1970) (stating that "[t]he states remain free to confine the selection [of jurors] to citizens"); Jugiro v. Brush, 140 U.S. 291 (1891); Strauder v. West Virginia, 100 U.S. 303 (1880). The United States Supreme Court summarily affirmed the Perkins court's decision. See Perkins v. Smith, 426 U.S. 913 (1976). We agree with the reasoning in these precedents and conclude that nothing in the Tennessee Constitution evidences an intention to confer upon non-citizen residents of Tennessee a greater protection from jury exclusion than that afforded by the Fourteenth Amendment.

Defendant Lopez's citation of our supreme court's holding in State v. Bell, 745 S.W.2d 858 (Tenn. 1988), is thus inapposite. While it is true that a criminal defendant is constitutionally entitled, under the Sixth Amendment to the United States Constitution, to "[s]election of a petit jury from a representative cross-section of the community," we agree with the State's contention on appeal that non-citizens are not members of the "community" at issue. See Cabell v. Chavez-Salido, 454 U.S. 432, 439-40 (1982) (stating that "[a]liens are by definition those outside of this community"). Because a fair cross-section of the community therefore need not include non-citizens, Defendant Lopez's effort to make out a prima facie violation of Bell's "fair cross-section requirement" is misplaced. See Bell, 745 S.W.2d at 860-61 (adopting the factors announced by the United State Supreme Court in Duren v. Missouri, 439 U.S. 357 (1979), the existence of which a defendant must demonstrate in order to prove a "fair cross-section" violation of the Sixth Amendment right to a jury trial).

We hold that Tennessee Code Annotated section 22-1-101's requirement that jurors be United States citizens does not violate the Tennessee Constitution. This issue is without merit.

**B. Exclusion of Full Statement to Police**

At trial, the State cross-examined the Defendant Lopez using a portion of the statement she made to Det. Bruner, in which she said that Defendant Gomez had not hit her. Defendant Lopez next contends that the trial court erred in preventing her from introducing the entire 125-page statement, instead allowing her to introduce the three pages of the statement surrounding and containing the specific exchange the State used to impeach her on cross-examination.

Tennessee Rule of Evidence 106 provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Because the State referred to Defendant Lopez's statement on cross-examination for the limited purpose of impeachment, and because "on its face Rule 106 refers to the <u>introduction of a portion of a writing by a party to the litigation</u>," <u>State v. Vaughn</u>, 144 S.W.3d 391, 408 (Tenn. Crim. App. 2003) (emphasis in original), the trial court held that Rule 106 was inapplicable to the current case. In <u>Vaughn</u>, however, we acknowledged "that this Court has previously held that a cross-examination in extensive detail about a witness's prior statement is tantamount to an introduction of the statement for Rule 106 purposes." <u>Id.</u> at 408 n.2 (citing <u>State v. Belser</u>, 945 S.W.2d 776, 788 (Tenn. Crim. App. 1996)).

Even assuming that the State's cross-examination of Defendant Lopez was sufficiently detailed to justify application of Rule 106, we nonetheless conclude that any error was harmless. Tennessee Rule of Appellate Procedure 36(b) states that "a final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."

Our review of the record and Defendant Lopez's statement to Det. Bruner reveals that the trial court admitted no less of the Defendant Lopez's statement than Rule 106 would have required had it been applied:

> [T]he standard for employing Rule 106 is ultimately one of fairness. Accordingly, the most important factor in determining whether Rule 106 should be invoked is whether the jury's accurate understanding of the evidence already admitted requires the admission of this additional information . . . . Thus, our federal courts require that the material sought to be admitted under the substantially identical Federal Rule of Evidence 106 does at least one of the following: (1) explains the already-admitted proof; (2) places the admitted

proof in context; (3) avoids misleading the trier of fact; or (4) ensures a fair and impartial understanding of the already-admitted proof.

Id. at 407. The three introduced pages of Defendant Lopez's statement sufficiently establish the context of the questions she was asked regarding whether Defendant Gomez had hit her, and include her answers such that the jury could evaluate whether or not she had mislead Det. Bruner. Nothing more was required to provide the jury with evidence sufficient to evaluate the consistency or inconsistency of her statement with the testimony she had offered about incidents of domestic violence perpetrated by Defendant Gomez. This issue is without merit.

## Conclusion

Based on the foregoing authorities and reasoning, we reverse and dismiss Defendant Gomez's Count Five conviction of aggravated child abuse. In all other respects, we affirm the judgments of the trial court.

The sentence for Defendant Gomez for the Count Five Conviction was ordered to be served consecutively to Gomez's other sentence. Because we have concluded that it was not error for the trial court to order consecutive sentences, we remand this case to the trial court solely to give the trial court the opportunity to restructure the remaining sentences such as to order one of the remaining sentences for aggravated child abuse to be served consecutively to the life sentence. Upon remand, this sentencing decision shall be within the discretion of the trial court.

_____
DAVID H. WELLES, JUDGE